UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Linda Havey and          :
Joanne Anderson,         :
     Plaintiffs,         :
                         :
     v.                  :     File No. 2:03-cv-313
                         :
Homebound Mortgage, Inc., :
Gary W. Tuorila, Judith  :
Tuorila, Shane Semprebon, :
and Kathy MacSween,      :
     Defendants.         :

## OPINION AND ORDER
### (Paper 49)

Plaintiffs Linda Havey and Joanne Anderson (collectively "Plaintiffs") filed this suit under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., against Defendants Homebound Mortgage, Inc., Gary W. Tuorila, Judith Tuorila, Shane Semprebon, and Kathy MacSween (collectively "Homebound"). Plaintiffs allege that, while they were employed by Homebound, they worked overtime for which they were never compensated. They seek compensation for that time, liquidated damages, attorney's fees and costs under the FLSA and under the Vermont Fair Employment Practices Act ("VFEPA"), 21 V.S.A. § 384(b). The case is currently before this Court on Homebound's motion for partial summary judgment.

For the reasons set forth below, Homebound's motion for summary judgment (Paper 49) is GRANTED.

## Background

Unless otherwise noted, the following facts are undisputed.  Homebound was incorporated in November 1998 and ceased doing business in July 2004.  (Paper 54, ¶ 1; Paper 58, ¶ 1).  Homebound initially acted as a mortgage broker, but by 2001 it had begun underwriting mortgage loans that were sold to the secondary lending market.  (Paper 54, ¶ 2; Paper 59, ¶ 2).  Havey was employed as an underwriter from approximately April 2002 until November 2003.  (Paper 54 ¶ 48; Paper 58 ¶ 48).  Anderson was employed at Homebound in July 2001; until October 2002, she typically worked less than forty hours per week. (Paper 54, ¶ 39, Paper 58, ¶¶ 76-77, 84).  After October 2002, she typically worked a full week.  (Paper 54, ¶ 39; Paper 58, ¶ 76).  In November 2003, Homebound began to reduce its work force; both Plaintiffs were terminated in the first reduction.  (Paper 54, ¶¶ 3-4; Paper 58, ¶¶ 3-4).

Underwriters at Homebound used criteria established by investors in the secondary lending market to determine whether to approve or deny a mortgage application.  (Paper

2

56, ¶ 3).  According to Homebound's job description for underwriters, their duties included "reviewing and clearing income, credit and asset conditions by determining that documentation provided meets Investor guidelines;" reviewing appraisals to ensure that the appraisals met investor guidelines and were reasonable compared to other properties; and determining the degree of risk for each mortgage application by ensuring the proper programs had been selected, and making counter-offers if necessary.  (Paper 50 Ex. 1).  Havey testified that the job description accurately described her duties, with several exceptions discussed *infra*.  (Paper 58, Ex. 2 at 29).

Underwriters used a computer program to determine whether a mortgage fit into certain lenders' criteria. (Paper 58, Ex. 1 at 19-20).  They would also manually confirm the data that had been entered into the computer program, and would determine to which lenders a particular loan could be sold.  (Id. at 21-24, 33-36).  If the underwriter approved a loan, that decision was not reviewed; if the underwriter rejected a loan, the decision was reviewed a percentage of the time.  (Id. at 35; 97-98).

## Summary Judgment Standard

Summary judgment should be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," Fed. R. Civ. P. 56(c), or "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000)(quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law.'" O'Hara v. Weeks Marine, Inc., 294 F.3d 54, 61 (2d Cir. 2002)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). An issue of fact is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

"When determining whether there is a genuine issue of fact to be tried, the court must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought." Winter v. United States, 196 F.3d 339, 346 (2d Cir. 1999). As to any claim or essential element for which the non-moving party bears the

burden of proof at trial, the non-moving party must make a showing sufficient to establish the existence of that claim or element. Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 95 (2d Cir. 1998)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); DiCola v. Swissre Holding, Inc., 996 F.2d 30, 32 (2d Cir. 1993)). "Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997).

Summary judgment is mandated, however, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## Discussion

### The FLSA

The FLSA was enacted to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers" and to ensure that employees are

fairly compensated.  29 U.S.C. § 202(a); see also Reich v. New York City Transit Auth., 45 F.3d 646 (2d Cir. 1995). The FLSA provides that employees must be compensated at a rate of at least one and one-half times their normal rate for any hours worked in excess of 40 hours per week.  29 U.S.C. § 207.  This provision does not apply to "any employee employed in a bona fide executive, administrative, or professional capacity."[1]  Id. at § 213.  An employee employed in an administrative capacity is defined by the regulations.[2]  29 C.F.R. § 541.2 (2002).

The regulations contain both a short test and a long test to determine whether an employee meets the administrative employee exemption.  Id.; see Kahn v. Superior Chicken & Ribs, Inc., 331 F. Supp. 2d 115, 117 (E.D.N.Y. 2004).  The short test applies to employees, like Plaintiffs, earning $250 or more per week.  29 C.F.R. § 541.2(e)(2) (2002); Kahn, 331 F. Supp. 2d at 117.  Under the

---

[1] The VFEPA has the same provision and exemption.  21 V.S.A. §§ 383-84.  Because the VFEPA tracks the FLSA, if Plaintiffs are exempt employees under the FLSA, they will be exempt under the VFEPA.  As such, the analysis in this opinion will be based on the FLSA, but will be applicable to the VFEPA claims as well.

[2] These regulations were revised effective April 23, 2004, but the revisions do not apply in this case.

6

short test, an employee whose primary work consists of "office or nonmanual work directly related to management policies or general business operations of his employer or his employer's customers," and requires "the exercise of discretion and judgment" is exempt as an administrative employee.  29 C.F.R. § 541.2 (2002).

Because Congress enacted the FLSA as a remedial act, its exemptions are to be construed narrowly.  See Martin v. Malcolm Pirnie, Inc., 949 F.2d 611, 614 (2d Cir. 1991).  The employer bears the burden of proving each element of an exemption.  Id.

A.  Salary Basis Requirement

In this case, there is no dispute that Plaintiffs received at least $250 per week during the time in question. Plaintiffs do dispute, however, that they were paid on a salary basis.

An employee is considered to be compensated on a salary basis if he "regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed."  29 C.F.R. §

541.118(a)(2002).[3]  The prohibition on salary reductions is subject to certain enumerated exceptions, including absences of a full day or more.  29 C.F.R. § 541.602(b)(2002).  In addition, under the regulations a salary may consist of a "minimum guarantee plus extras."  29 C.F.R. 541.118(b)(2002).  The regulations explain:

> It should be noted that the salary may consist of a predetermined amount constituting all or part of the employee's compensation. In other words, additional compensation besides the salary is not inconsistent with the salary basis of payment. . . . The test of payment on a salary basis will not be met, however, if the salary is divided into two parts for the purpose of circumventing the requirement of payment "on a salary basis". For example, a salary of $ 200 in each week in which any work is performed, and an additional $ 50 which is made subject to deductions which, are not permitted under paragraph (a) of this section.

Id.

In this case, Homebound argues that all underwriters were guaranteed a salary of $48,000 per year, but that each underwriter could increase her actual pay by setting a productivity goal for each quarter.  (Paper 54, ¶¶ 24-26; Paper 52, ¶ 8 & Ex. 1).  Plaintiffs argue that they were

---

[3] This regulation explains salary as it pertains to an employee employed in a bona fide executive capacity, but is applicable to employees employed in a bona fide administrative capacity, as well.  See 29 C.F.R. § 541.212 (2002).

paid hourly, pointing to documents that Homebound filed with the state of Vermont as proof. (Paper 58, ¶ 73 and Ex. 3). These documents deal with calculating Plaintiffs' unemployment benefits, and are not conclusive in determining how they were paid for the purposes of the FLSA, however.

In addition, Plaintiffs argue that their pay could have been reduced for absences of less than a day, but it never was because they never took such absences unless they had accrued vacation or sick leave time. (Paper 58, ¶¶ 74-75). Finally, Anderson argues that reductions in her paycheck for less than a day's absence did occur before late October 2002, and that those deductions can be used to show that Havey was not a salaried employee, and that Anderson was not salaried after December 2002.

Homebound does not dispute that Anderson was paid on an hourly basis before December 2002, but argues that she was a part-time employee at that time. The motion for summary judgment currently before the Court deals only with Havey's claims and Anderson's claims after December 2002, when Homebound alleges that Anderson became a full-time, salaried employee. Plaintiffs further argue that there was no distinction between Anderson's status as a part-time

employee and a full-time employee other than the fact that a
full-time employee was expected to work 40 hours per week.
(Paper 57, p. 13).  Even assuming that this distinction was
the only difference between a part-time and full-time
employee, however, it is undisputed that Anderson was paid
on an hourly basis before December 2002.  In addition,
Anderson testified during her deposition that her status
changed in December 2002.[4]  (Paper 54, p. 77).  Anderson
testified that she reported her hours worked to her
supervisor when she started, but that she was paid based on
a goal after December 2002.  (Paper 58, Ex. 1 at 17-19, 77-
78).  Havey testified that she never submitted any hours,
other than when she was requesting time off.  (Paper 58, Ex.
2 at 38-40).  Therefore, as Homebound argues, any deductions
in Anderson's weekly pay before December 2002 are not
indicative of whether Havey was paid on a salary basis
throughout her employment and whether Anderson was paid on a
salary basis after December 2002.

Plaintiffs argue that they were not paid on a salary

---

[4] In fact, Anderson testified that she switched from an
hourly pay rate to a salary in December 2002.  (Paper 54, p.
77).  Because "salary" is a defined term under the
regulations, Anderson's use of salary in describing how she
was paid is not conclusive.

10

basis because they were subject to pay deductions based on absences.  The regulations permit deductions for absences of a day or more, when the absence is due to personal reasons or sickness.  29 C.F.R. § 541.118 (2002).  In addition, several courts have held that reductions to an employee's accrued leave time for absences of less than half a day do not affect salary status.  See Aaron v. City of Wichita, 54 F.3d 652, 658 (10th Cir. 1995); Barner v. City of Novato, 17 F.3d 1256, 1261-62 (9th Cir. 1994); Cooke v. General Dynamics Corp., 993 F. Supp. 50, 52 (D. Conn. 1997). Plaintiffs do not argue that deductions from paid leave accounts affect their salary status.  Instead, they argue that their pay could have been reduced for partial day absences if they did not have accrued time.  They argue that they simply were never subject to such deductions, because they never took partial day absences unless they had accrued time.

   The Supreme Court has held that the mere possibility of a deduction for an absence of less than half a day is not sufficient to deny exempt status under the salary-basis test.  Auer v. Robbins, 519 U.S. 452, 461-63 (1997). Instead, an employee must show either an actual practice of

11

improper deductions or "a clear and particularized policy--one which 'effectively communicates' that deductions will be made in specified circumstances." Id. at 461; see also Ahern v. County of Nassau, 118 F.3d 118, 121-22 (2d Cir. 1997)(applying Auer).  In this case, Plaintiffs point to no policy that allowed reductions in pay for partial days off, other than the fact that the employees' leave approval papers contained a space for tracking fractional-day absences, even for unpaid time off.  In addition, Plaintiffs point to no actual instances of deductions in pay for absences of less than a day from any employee purportedly paid on a salary basis.  In addition, Havey was tardy on three occasions, and was not subject to a reduction in her paycheck.  (Paper 58, Ex. 2 at 169-70).  As such, there is no evidence that Homebound had a clear and particularized policy of pay deductions for absences of less than a full work day.

Plaintiffs also argue that they were subject to quantity reductions, because their salaries were set quarterly and were dependent on their efficiency in reviewing loans.  As already noted, all underwriters were guaranteed a salary of $48,000.00 per year, or $923.00 per

week before taxes.[5]  (Paper 52, ¶ 8 & Ex. 1).  They could
then choose to increase their pay by agreeing to process
more loans during the quarter.  (Id.).  Adjustments were
made quarterly and were prospective only.  (Id.).

   The fact that underwriters at Homebound could choose to
process more loans and receive additional pay does not
contradict the fact that were salaried.  As already noted,
the regulations permit compensation to include a minimum
guaranteed salary plus extras.  29 C.F.R. §
541.118(b)(2002).  At least one court has held that, as long
as there is a non-deductible guaranteed salary, monthly
fluctuations based on productivity did not affect the salary
basis test.  See Hogan v. Allstate Insurance Co., 361 F.3d
621, 625-26 (11th Cir. 2004).  At all times, Plaintiffs were
guaranteed a salary of $48,000.00 per year, regardless of
how few loans they processed.  Each quarter, underwriters
could choose the number of loans they wished to process, and
adjust their pay accordingly.  It does not appear that their

---

   [5] This is the salary level as of January 2003.  When
Havey began working at Homebound, she received $903.85 per
week before taxes, but there is nothing in the record
indicating an underwriter's salary before January 2003.
(Paper 50, Ex. 2).  In addition, Havey testified that the
pay structure changed in late 2002.  (Paper 58, Ex. 2 at
127).  At any rate, Havey always received a weekly amount in
excess of the $250 per week required for the short test.

salaries could be adjusted involuntarily except at the quarterly review.  The pay scheme used by Homebound is not inconsistent with underwriters being paid on a salary basis.

Finally, Plaintiffs argue that they were not salaried, because deductions could be made from their salary based on quality issues.  The job description sheet indicated that "Defects over 5 in a 100, base will be reduced to next level down until defects are under control.  Defects will be measured based on the QC Notice of Exceptions Forms." (Paper 52, Ex. 1).  The base level could not drop below $48,000.00 per year, however.  (Paper 52, ¶ 8).  Plaintiffs point to no clear and particularized policy of making such deductions.  There is no evidence that any quality control deductions were ever made.  In addition, Tina Boutin, the former manager of the Underwriting Department at Homebound, stated that no system for tracking defects over five per month was ever put in place.  (Id. at ¶ 9).  Even assuming that the policy was in place, however, any reductions were prospective, and were to efficiency pay only, never to the base salary of $48,000.00 per year.  As such, the mere possibility that Homebound had a policy of reductions based on quality does not contradict the fact that Plaintiffs were

14

paid on a salary basis.

    B.  <u>Duties Test</u>

All underwriters were guaranteed a salary of more than $250.00 per week.  In order for Plaintiffs to be exempt under the administrative exemption, therefore, their primary duty must have consisted of "office or nonmanual work directly related to management policies or general business operations" of Homebound or its customers, and must include "work requiring the exercise of discretion and independent judgment."  29 C.F.R. § 541.2(a)(1) & (e)(2).

Plaintiffs argue that although their work was non-manual office work, it was related to the production side of Homebound's business, not administration.  Plaintiffs point to no support for this assertion, however, and the argument is without merit.  Plaintiffs were responsible for underwriting loans by reviewing the applications and recommending whether loans should be accepted or rejected.  This is plainly nonmanual work related to Homebound's business.[6]  The only question remaining, then, is whether

---

   [6] In other cases, the line between administrative work and production work is not so clear.  <u>See</u> <u>e.g.</u>, <u>Cooke v. General Dynamics Corp.</u>, 993 F. Supp. 56 (D. Conn. 1997).  In that case, however, the corporation was in the business of producing submarines.  <u>Id.</u>  Homebound was in the business of underwriting mortgage loans.  No production was taking

the work included the exercise of discretion or independent judgment.

Plaintiffs argue that they did not exercise discretion or independent judgment because the job required only a high school diploma.  (Paper 57, pp 4-6).  In addition, they argue that the job was automatic.  (Id.).  Specifically, they argue that they were responsible merely for inputting information into the automatic underwriting software, and could not exercise any discretion.  (Paper 58, Ex. 2 at 16).  They further argue that the underwriters were required to apply various standards and adhere to a series of guidelines when making their decisions, the underwriters' tasks were mechanical, they could not approve any loan denied by the automatic underwriting software, any denials were reviewed by a supervisor, and that the underwriters merely reviewed the criteria and checked off boxes on a form, which then determined whether a loan would be approved or denied.  (Paper 57, pp 4-6).

The regulations define discretion and independent judgment as involving "the comparison and the evaluation of possible courses of conduct and acting or making a decision

---

place.

16

after the various possibilities have been considered." 29 C.F.R. § 541.207(a) (2002). In addition, the term "implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." Id. The regulations distinguish discretion and independent judgment from "the use of skill in applying techniques, procedures, or specific standards." 29 C.F.R. § 541.207(b) (2002). The regulations list graders of lumbers, personnel clerks who screen applicants, and comparison shoppers as examples of the types of employees that merely apply skill. Id.

Although Plaintiffs emphasize their lack of higher education and irrelevant work experience, both were experienced with mortgage processing when they were hired by Homebound. Havey worked as a mortgage loan processor at National City Bank in Columbus, Ohio immediately prior to being hired by Homebound. (Paper 58, Ex. 2 at 6-9). Anderson worked at Chittenden Bank in the mortgage department for nineteen years, including a couple of years as an underwriter. (Paper 58, Ex. 1, at 5-7).

The underwriters at Homebound were responsible for,

17

among other things, "reviewing and clearing credit, income and asset conditions by determining that documentation provided meets Investor Guidelines;" determining the reasonableness of a specific appraisal by comparing it with comparable properties; determining the degree of risk of each loan; analyzing new loans to ensure proper programs were selected; making counter-offers if necessary; advising processing and sales staff if additional documentation was required; and recommending action on each loan. (Paper 50, Ex. 1). Havey conceded that the job description just cited accurately described the underwriter position "for the most part," with a few exceptions not relevant here.[7] (Paper 58, Ex. 2 at 29). Homebound did use an automated program for at least some of the loans. (Paper 58, Ex. 1 at 19-22; Ex. 2 at 1617). Loan originators would input certain information into the program, and the applications were either approved or rejected. (Paper 58, Ex. 2 at 17). The loan originator would then collect additional information on the approved loans, and send the entire file to the underwriters. (Id.).

---

[7] The exceptions noted were that underwriters did not formulate or revise the procedures followed, they did not manage the underwriting pipeline, they did not provide junior underwriters with training, and they did not train or mentor people. (Paper 58, Ex. 2 at 29).

The underwriter would then check the contents of the file against the underwriting guidelines, ensuring that such things as income level and appraisal values were accurate. (<u>Id.</u> at 17-20).

Havey testified that she spent anywhere from an hour to three days on a particular loan. (<u>Id.</u> at 34-36). She further testified that she would decide whether a particular loan "fit in the box," that is, could be accepted or rejected outright, or whether it needed additional approval. (<u>Id.</u> at 36-37). She further testified that "sometimes you just need to percolate on it for a while and, you know, think about what's in the file to be sure that you are meeting the guidelines." (<u>Id.</u> at 36). If the process were truly automatic, there would be no need to "percolate." Anderson testified that the underwriter made the ultimate decision of whether to approve a loan. (Paper 58, Ex. 1 at 35). She also testified that, when a loan did not meet certain criteria, then she would "offer other information that might make the loan work." (<u>Id.</u> at 36). In addition, Anderson testified that underwriters decided which lender a mortgage could go to, or whether the loan could go to one of several lenders. (<u>Id.</u> at 90-96). The decision that a loan

19

was saleable was not reviewed; a percentage of the decisions that a loan was not saleable was reviewed.  (Id. at 96-98).

Two other former underwriters with Homebound submitted affidavits stating that their job involved analyzing mortgage applications to determine whether a particular application matched a particular lender.  The fact that this analysis was guided by standards does not mean that the underwriters exercised no discretion or judgment.  Although the Second Circuit has not spoken on this issue, a similar situation has been addressed by the Eighth Circuit. McAllister v. Transamerica Occidental Life Ins. Co., 325 F.3d 997, 1001 (8th Cir. 2003).  In McAllister, an insurance claims adjuster argued that she did not exercise discretion and independent judgment, because she was required to follow state law and the procedures in a claims manual.  Id.  In rejecting her argument, the Eighth Circuit stated that the caution in the regulation distinguishing between skill and discretion "appl[ies] to employees who develop skills based on specific guidance and then simply apply those skills based on memory, without exercising any discretion or independent judgment."  Id. at 1002.

Here, as in McAllister, although the underwriters

20

relied on the procedures to guide their decisions, they still had to determine into which guidelines a particular loan fit, seek additional information as necessary, and ensure that the proper program was selected. The fact that an automated program guided their decision-making process or directed loan approval is not sufficient to permit a jury to find that Plaintiffs exercised no judgment and discretion in their duties. All of these decisions were made with relatively little supervision, and are sufficient to meet the duties test. As such, Havey was an exempt employee at all times during her employment, and Anderson was an exempt employee after her new employment agreement in December 2002. Homebound is entitled to summary judgment on all of Havey's claims for overtime, and on Anderson's claims after she became a full-time underwriter.

## Conclusion

For the foregoing reasons, Homebound's motion for summary judgment (Paper 49) is GRANTED as to all of Havey's claims and GRANTED as to Anderson's claims after she became a full-time underwriter in December 2002. The only claims that remain are Anderson's claims for overtime before December 2002.

21

Dated at Burlington, in the District of Vermont, on this 21st day of July, 2005.

/s/ Jerome J. Niedermeier
Jerome J. Niedermeier
United States Magistrate Judge